# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA P. PETITT,<br><br>            Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE,<br>COMMISSIONER OF SOCIAL<br>SECURITY,<br><br>            Defendant. | ) 1:08-cv-01934-GSA<br>)<br>) DECISION AND ORDER DENYING<br>) PLAINTIFF'S SOCIAL SECURITY<br>) COMPLAINT (DOC. 1)<br>)<br>) ORDER DIRECTING THE ENTRY OF<br>) JUDGMENT FOR DEFENDANT MICHAEL J.<br>) ASTRUE, COMMISSIONER OF SOCIAL<br>) SECURITY, AND AGAINST PLAINTIFF<br>) LINDA P. PETTIT<br>) |

Plaintiff is proceeding with counsel with an action seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying Plaintiff's application, which was protectively filed on November 16, 2005, and made pursuant to Title II of the Social Security Act, for a period of disability and disability insurance benefits (DIB), and in which she alleged she had been disabled since July 8, 2000, due to diabetes, foot problems, enlarged heart, high blood pressure, anxiety, and upper GI problems, causing pain, distraction, and inability to get around and stand for long periods. (A.R. 9, 108-110, 108, 121, 125.) The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1),

manifesting their consent in writings signed by the parties'
authorized representatives and filed on behalf of Plaintiff on
December 16, 2008, and on behalf of Defendant on January 9, 2009.
Thus, the matter is assigned to the Magistrate Judge to conduct
all further proceedings in this case, including entry of final
judgment.

The decision under review is that of Social Security
Administration (SSA) Administrative Law Judge (ALJ) Christopher
Larsen, dated September 3, 2008 (A.R. 9-15), rendered after a
hearing held on June 30, 2008, at which Plaintiff appeared and
testified with the assistance of an attorney (A.R. 16-56).
Plaintiff's daughter, Christina Renee Petitt, and Thomas
Dashlette, a vocational expert (VE), also testified. (A.R. 53-
55.)

The Appeals Council denied Plaintiff's request for review of
the ALJ's decision on October 29, 2008 (A.R. 1-3), and thereafter
Plaintiff filed the complaint in this Court on December 16, 2008.
Briefing commenced on July 30, 2009, and was completed with the
filing of Plaintiff's reply brief on September 15, 2009. The
matter has been submitted without oral argument to the Magistrate
Judge.

I. Jurisdiction

The Court has subject matter jurisdiction pursuant to 42
U.S.C. § 405(g), which provides that individuals may obtain
judicial review of a final decision of the Commissioner of Social
Security by initiating a civil action in the district court
within sixty days of the mailing of the notice of decision.
Plaintiff timely filed her complaint on December 16, 2008, less

2

than sixty days after the mailing of the notice of decision on or about October 29, 2008.

II. <u>Standard and Scope of Review</u>

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," <u>Richardson v. Perales</u>, 402 U.S. 389, 402 (1971), but less than a preponderance, <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson</u>, 402 U.S. at 401. The Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of evidence that supports the decision. <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006); <u>Jones v. Heckler</u>, 760 F.2d 993, 995 (9th Cir. 1985). It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the determination of the Commissioner as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, and not the Court's, to resolve conflicts in the evidence. <u>Sorenson v. Weinberger</u>, 514 F.2d 1112, 1119 (9th Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. <u>Burkhart v.</u>

Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must
review the whole record and uphold the Commissioner's
determination that the claimant is not disabled if the
Commissioner applied the proper legal standards, and if the
Commissioner's findings are supported by substantial evidence.
See, Sanchez v. Secretary of Health and Human Services, 812 F.2d
509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If
the Court concludes that the ALJ did not use the proper legal
standard, the matter will be remanded to permit application of
the appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th
Cir. 1987).

III. Disability

A. Legal Standards

In order to qualify for benefits, a claimant must establish
that she is unable to engage in substantial gainful activity due
to a medically determinable physical or mental impairment which
has lasted or can be expected to last for a continuous period of
not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A).
A claimant must demonstrate a physical or mental impairment of
such severity that the claimant is not only unable to do the
claimant's previous work, but cannot, considering age, education,
and work experience, engage in any other kind of substantial
gainful work which exists in the national economy. 42 U.S.C.
1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th
Cir. 1989). The burden of establishing a disability is initially
on the claimant, who must prove that the claimant is unable to
return to his or her former type of work; the burden then shifts
to the Commissioner to identify other jobs that the claimant is

4

capable of performing considering the claimant's residual functional capacity, as well as her age, education and last fifteen years of work experience. <u>Terry v. Sullivan</u>, 903 F.2d 1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific sequential determinations in the process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the impairment, 20 C.F.R. § 404.1520;[1] 2) whether solely on the basis of the medical evidence the claimed impairment is severe, that is, of a magnitude sufficient to limit significantly the individual's physical or mental ability to do basic work activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the basis of medical evidence the impairment equals or exceeds in severity certain impairments described in Appendix I of the regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant has sufficient residual functional capacity, defined as what an individual can still do despite limitations, to perform the applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and 5) whether on the basis of the applicant's age, education, work experience, and residual functional capacity, the applicant can perform any other gainful and substantial work within the economy, 20 C.F.R. § 404.1520(f).

B. <u>The ALJ's Findings</u>

The ALJ found that Plaintiff had a severe impairment of peripheral neuropathy; her adjustment disorder with mixed mood

---

[1] All references are to the 2008 version of the Code of Federal Regulations unless otherwise noted.

was only a slight impairment which had minimal, if any, effect on Plaintiff's ability to work. (A.R. 11.) On December 31, 2005, the date on which Plaintiff last met the insured status requirements of the Act, Plaintiff had no impairment or combination of impairments that met or medically equaled a listed impairment. (A.R. 11-12.) Plaintiff retained the residual functional capacity (RFC) to lift and carry fifty pounds occasionally and twenty-five pounds frequently; stand and walk, or sit, a total of six hours in an eight-hour workday; occasionally climb ladders, ropes, and scaffolds; and avoid concentrated exposure to unprotected heights and uneven surfaces. (A.R. 12.) Plaintiff could perform her past relevant work as a human resources director, and thus she was not disabled at any time from July 8, 2000, the alleged onset date, through December 31, 2005, the date last insured. (A.R. 15.)

C. <u>Plaintiff's Contentions</u>

Plaintiff argues that the ALJ erroneously failed to 1) find that Plaintiff was credible, 2) adopt the testimony of Plaintiff's daughter, 3) adopt consulting examiner Dr. Dozier's limitation of standing and walking only two to four hours in an eight-hour day, 4) adopt the assessment of Mary Anderson, F.N.P, at Visalia Health Clinic, and 5) call on the services of a medical advisor to determine the date of onset of Plaintiff's impairments and thereby comply with Social Security Ruling 82-30. (Plaintiff's Opening Brief, pp. 6-7.)

IV. <u>Medical Evidence</u>

Progress notes from Plaintiff's visits to Dr. Booker at Visalia Family Practice in 2000 show an entry regarding borderline diabetes in April 2000 without any treatment

indicated; Plaintiff was medicated for stress. (A.R. 191-92.)

Notes from Visalia Family Practice show that in December 2001, Plaintiff reported better mood and no crying spells on Effexor after having been diagnosed by Dr. Booker with anxiety and depression in November 2001. Plaintiff reported that she was looking for work. (A.R. 188.)

Plaintiff was prescribed Paxil at Visalia Family Practice in 2002, but she never picked it up. She was unemployed and being supported by her father; she was under house arrest and was feeling overwhelmed. She did not want any medication unless it was like Xanax. She complained that her feet hurt, but upon examination the doctor found good color and pulse and no deformity. Dr. Booker prescribed a vibrating foot massager and Xanax. (A.R. 187.)

In January 2003, Jaime Aguet, M.D., a radiologist, opined that there was a calcaneal spur on Plaintiff's right foot with an area of demineralization involving the fifth metatarsal head with indeterminate etiology. Dr. Aguet wrote that the differential diagnosis would include osteomyelitis. (A.R. 692.)

In June 2003, Dr. Booker diagnosed stress and foot pain when Plaintiff, who was unemployed and on probation, complained of stress, foot numbness and pain causing difficulty walking, and decreased sleep and appetite. Dr. Booker found that the feet were mildly mottled but with good "DP" pulse, good capillary refill in the toe tips, and mild tenderness at the area of the left third metatarsal head. Dr. Booker prescribed Lexapro and noted that the plan was to find employment. (A.R. 18.)

In January 2004, Plaintiff, who was medicated with Atenolol

and Alprazolam, was taking classes at adult school and reported to Dr. Bishop "OK" sleep and appetite and decreased crying spells. (A.R. 185.) In May 2004, Dr. Bishop found a thickened sclerotic left second toenail; Lamisil was prescribed. (A.R. 185.)

In 2005, progress notes from Dr. Booker's office reflect that Plaintiff continued to be medicated with Atenolol and Xanax. In October, Plaintiff complained of pain in both feet and reported that she had fallen twice secondary to foot pain. Dr. Booker found dry, slightly darkened feet with 2/4 pitting pedal edema; DP and PT pulses were palpable, and sensation was reduced to the monofilament bilaterally. The impression was dependent edema with "HE" (m), and "Peripheral neuropathy-? Etol." (A.R. 184.) Plaintiff also reported that she was drinking "litle Etoh," (A.R. 184.)

In November 2005, Frank A. Mancuso opined with respect to tests concerning Plaintiff's lower extremities that Plaintiff had only mild atherosclerotic disease of the arteries of the left and right legs. (A.R. 180, 697.)

On December 1, 2005, Boota S. Chahil, M.D., a specialist in neurology and neurophysiology, performed motor and sensory nerve conduction studies after Plaintiff related that she had a history of diabetes, leg pain and numbness that was slowly progressive, and difficulty walking. Dr. Chahil opined that there was evidence of severe sensory motor polyneuropathy as seen in diabetes mellitus and evidence of active and chronic denervation in distal muscles only revealed by EMG needle examination of the tibialis anterior, peroneus longus, gastrocnemius, and vastus medialis

muscles. Individual motor units were normal in configuration, duration, and amplitude in all muscles except the distal muscles. Motor nerve conduction studies revealed that some nerve responses were absent. There was no evidence of ongoing lumbar radiculopathy or compression neuropathy. (A.R. 179.)

On December 6, 2005, Mary Anderson, F.N.P, of the Visalia Health Care Center of the County of Tulare, examined Plaintiff and assessed severe sensory polyneuropathy secondary to diabetes mellitus. The plan was to give Plaintiff a letter for school and a "GR" form and to request a scholarship for Plaintiff. (A.R. 342.) Anderson completed a "GENERAL ASSISTANCE EMPLOYABILITY EXAMINATION REPORT," in which she opined that Plaintiff had diabetes, neuropathy, anxiety disorder, and hypertension, with fair prognosis for activities of daily living but poor prognosis for work, and she was permanently physically and mentally incapacitated from any type of work. The time of the incapacity was also identified as "12." (A.R. 343, 389.) Later that month Anderson assessed depression and insomnia and provided Seroquel samples to take as directed. (A.R. 341.)

On December 7, 2005, Plaintiff visited the emergency room for abdominal and back pain after having eaten sausages and drunk wine the night before. The impression was gastritis. (A.R. 735.) (A.R. 727.)

In January 2006, Plaintiff stopped taking Seroquel because it caused her to sleep all day. (A.R. 340.)

On January 30, 2006, licensed psychologist Mary K. McDonald, Ph.D., reviewed records from 2002 through 2005 and performed a consulting, psychological evaluation of Plaintiff, who asserted

that she was unable to work primarily because of anxiety and depression, although she also complained of carpel tunnel and numbness in her feet. (A.R. 192-99.) She reported the termination of her job at Target and allegations of embezzlement; she stated she had defended herself on an embezzlement charge and had the felony reduced to a misdemeanor for which she served house arrest. Thereafter, she attended a community college for a real estate credential but fell twice at the college because her feet went numb, and therefore she was unable to complete that program.

Plaintiff also stated that all she wanted was a medical card and a food card; she lived with her dad and just needed a way of providing for food and her insurance. Her frustration regarding the problems she was having in obtaining disability was so great that she had written to the governor, her congressman, and a state senator. She expressed anxiety about the purpose of Dr. McDonald's evaluation and repeatedly indicated that she would like a copy of the report. Before each test that was administered, Plaintiff complained that she could not do it and that it was too hard and terrible.

Plaintiff reported that Dr. Ow-Yong had given her samples of Seroquel and Pregabatin, which she did not take because the Seroquel would "bonk" her out. Plaintiff did not see a therapist because she did not understand that it was available on her card. She no longer saw Dr. Booker because she did not have insurance. (A.R. 192.)

Dr. McDonald found that Plaintiff was oriented in all three spheres, memory for recent and long-term events was unimpaired, she appeared to be fairly bright, and she was alert, pleasant,

anxious, and cooperative. Plaintiff denied suicidal ideation, exhibited no indications of delusions or hallucinations, worked slowly, and was easily distracted. Her gait was unimpaired.

On the Bender Visual Motor Gestalt II, Plaintiff's scores suggested low ability within the borderline range, but she had executed the designs using her right hand, which was in a brace. On the Wechsler Adult Intelligence Scale III, only the verbal section was administered because of problems with Plaintiff's right hand, but she obtained a verbal IQ of 72 in the third percentile and within the borderline range. Dr. McDonald noted that this was not at all consistent with someone who had worked as a human resources director for Target, attended college, and defended herself on an embezzlement charge; the doctor questioned how much effort Plaintiff was putting forth, especially considering Plaintiff's constant questioning why she had to do something and her need for tremendous reassurance and encouragement to continue. On the Miller Forensic Assessment of Symptoms Test, her raw score of eighteen was well above the cut-off level of six, and norms indicated that people with such scores might be exaggerating their symptoms. Plaintiff had endorsed rare combinations of symptoms, items that suggested that she was easily suggestible, and rare occurrences. (A.R. 194.)

Dr. McDonald's assessment was rule out malingering; social phobia or social anxiety disorder; noncompliance with medical treatment; and adult anti-social behavior; there was no diagnosis on Axis II, and the global assessment of functioning (GAF) was sixty-five with ability to handle funds. The prognosis was questionable. (A.R. 195.) Dr. McDonald recommended that with

respect to Plaintiff's moderate anxiety, in view of Plaintiff's endorsement of many highly unusual symptoms that rarely occur together, "one would question if she may be exaggerating her difficulties." (A.R. 195.) Dr. McDonald opined that it would appear that any disability benefits would primarily be based on the presence of physical difficulties.

On February 11, 2006, consulting examiner Dr. Emanuel Dozier, M.D., reviewed medical records and test results and performed a comprehensive internal medicine evaluation of Plaintiff, who was fifty-one years old and complained of two years of numbness, tingling, and burning pain in both feet, occasional numbness and tingling in her right hand, difficulty feeling the floor beneath her feet, and limitations of standing for only thirty minutes and walking one-quarter block. (A.R. 200-04.) Plaintiff reported that although her constant pain was generally a 10/10, she took no medication for relief. Plaintiff reported that although she had been diagnosed with polyneuropathy likely secondary to diabetes, she had submitted to three tests done to evaluate her blood sugars, and the highest level was 115 and the lowest 80; further, she was not on any special diet, and she was undergoing no treatment for diabetes or neuropathic pain. Dr. Dozier wrote that Plaintiff's history of diabetes was questionable. (A.R. 201.) Plaintiff reported that she was an occasional drinker of wine. Her medications included Atenolol, Alprazolam, Triamterene, and Seroquel. (A.R. 201.) Plaintiff was alert, oriented, and able to sit without discomfort, transfer on and off the exam table without assistance, and ambulate with a normal, steppage gait down the hall without signs of pain,

ataxia, or shortness of breath. (A.R. 201.) Plaintiff's back had normal muscle bulk and tone, no kyphoscoliosis, no trigger points or paravertebral spasm, negative straight leg raising, and preserved, normal cervical-lordotic curves. Extremities were normal. Plaintiff did not use an assistive device. Motor and grip strength were 5/5 bilaterally in all extremities. There was impairment of light touch with L5-S1 distribution and pinprick with L5-S1 distribution in both lower extremities, with vibration and position senses intact.

Dr. Dozier's impression was peripheral neuropathy, etiology unknown, rule out diabetes. Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently, stand and walk for two to four hours, and sit for six hours. (A.R. 204.) Dr. Dozier opined that Plaintiff's impairment of sensation in her lower extremities would make postural activities such as frequent stooping and squatting a problem, but she had no manipulative or special sense restrictions. She could not climb ladders or work on inclined planes, uneven terrain, scaffolds, or overhangs due to impairment of sensation in both feet. (A.R. 203.)

In March 2006, Plaintiff visited the emergency room with complaints of abdominal pain that was sharp on the left side, and swelling; she denied depression or anxiety. (A.R. 699-706.) Plaintiff denied a history of hepatitis or immune disorders, and she reported that she had drunk heavily for only one year. (A.R. 706, 709.) She also reported that she had drunk regularly for more than twenty-five years. (A.R. 711.) Tests for hepatitis, hepatitis C, and malignancy were negative; an abdominal echogram survey reflected an echogenic and coarsened liver that appeared

somewhat small, and moderate ascites in the upper abdomen. Plaintiff was hospitalized for ten days and was released with medication. (A.R. 709-10, 714-15.) Dr. Afshin Nahavandi opined that she would be medicated for new onset ascites, secondary to cirrhosis, which was in turn secondary to alcohol dependency. (A.R. 710.) Dr. Malay Myaing noted that Plaintiff would be admitted and that alcohol withdrawal would be monitored. (A.R. 713.)

Charles McElroy reported that a chest x-ray taken in March 2006 revealed a normal heart, mild asymmetric elevation of the right hemidiaphragm, and no acute or focal disease; the lungs were without effusion or pneumothorax. (A.R. 717.) CT scans of the pelvis and abdomen resulted in an impression of extensive abdominal/pelvic intraperitoneal ascites; edematous/congestive changes in the peritoneal mesentery; and abnormal, nonspecific appearance of the liver, suggesting chronic cirrhosis, with two dense lesions in the posterior right hepatic lobe, suggestive of intrahepatic hemangiomas. (A.R. 718-19.) Approximately 3,000 milliliters of ascites were subsequently removed via ultrasound-guided paracentesis. (A.R. 722.)

On April 28, 2006, Durell Sharbaugh, M.D., a non-examining state agency consultant and neurologist, opined that Plaintiff's neuropathy was not severe because Plaintiff's complaints of pain were not credible, Plaintiff needed no serious pain control, her gait was unaffected, and progress notes did not indicate any severe impairment. Further, Dr. Dozier's limitations on lifting and carrying were not well-supported, and the four-hour standing and walking limitation was out of line in view of Plaintiff's

normal gait and motor exam and the absence of any atrophy. (A.R. 205-06.)[2]

On April 28, 2006, non-examining state agency consultants F. A. Breslin, Ph.D., a psychologist, and Lee M. Coleman, Ph.D., opined concerning Plaintiff's mental impairments of affective disorder, namely adjustment disorder with mixed mood described by Dr. Booker, which was reflected by sleep problems, poor appetite, low energy, and anger; anxiety-related disorder, namely, the situational adjustment disorder with mixed mood described by Dr. Booker on June 17, 2003, reflected in anger over defending herself over an extortion charge; and personality disorder, namely, the adult anti-social behavior assessed by the consulting examiner, exhibited by malingering and noncompliance with medical treatment, the result on the Miller Forensic Assessment of Symptoms Test of highly positive for symptom exaggeration and malingering, her history of embezzlement, and her inconsistent behavior with the consulting examiners.[3] Plaintiff had only mild difficulties in maintaining social functioning and maintaining concentration, persistence, and pace. Her impairments were not severe and resulted in no work restriction before the date last insured. (A.R. 206, 349-62.)

On May 2, 2006, a person whose name was illegible opined on a form for a "GENERAL ASSISTANCE EMPLOYABILITY EXAMINATION REPORT" that Plaintiff's cirrhosis of the liver and jaundice

---

[2] The physical assessment is unsigned. (A.R. 206.)

[3] At the examination by the medical consultant, Plaintiff was poised, cooperative, and pleasant; at the exam by the psychological consultant, Plaintiff promoted her inabilities.

secondary to alcoholism caused Plaintiff to be permanently incapacitated from work for one year. (A.R. 741.)

In May 2006, Richard Anderson, M.D., reported that an x-ray of Plaintiff's right foot and ankle revealed mild, degenerative, arthritic changes involving the ankle joint and the interphalangeal joints of the toes, a large plantar calcaneal spur, but no fractures or other acute abnormalities. (A.R. 338, 614.)

In July 2006, Dr. Brandon Hawkins, M.D., examined Plaintiff's feet. Nails of the second toe of the left foot showed dystrophic changes and thickening consistent with mycotic changes; there was also hyper-pigmentation and dystrophic and atrophic changes to the skin, lack of hair growth, weak but palpable pedal pulses noted to DP and PT bilaterally, loss of protective sensation with 5.07 monofilament, hammertoe deformities, tailor's bunion, and hallux abductovalgus deformity. (A.R. 384-85.)

In August 2006, Plaintiff was admitted to the hospital for a week with fever, jaundice, diarrhea, vomiting, and headache; Plaintiff's daughter reported that for one day her mother had been confused and delusional. (A.R. 305, 308, 294-329.) Plaintiff's hepatic panel showed that her hepatitis C antibody was negative, so she did not have hepatitis C; the diagnosis was basically alcoholic cirrhosis, change of mental status secondary to a high protein diet and pain medicine, and alcoholic liver cirrhosis with edema. (A.R. 322-23, 563.) Plaintiff reported that she had stopped drinking in March 2006. (A.R. 309.) Later in August 2006, Vinod K. Gupta, M.D., reported that an

echocardiogram to test for congestive heart failure reflected normal functions with trace mitral regurgitation, increased A-wave suggesting decreased left ventricular compliance, and trace mitral, trace aortic, and trace to mild tricuspid regurgitation. (A.R. 303, 306.)

Plaintiff exhibited signs of edema in August and September 2006. (A.R. 334-35.) In November 2006, a pre-operative chest x-ray was negative. (A.R. 677.)

In December 2006, Plaintiff had surgery for hammertoe correction 2-5, bunionectomy right foot, and exostectomy right foot. The postoperative diagnosis was painful bunion deformity of the right foot with painful hammertoe deformity, digit 2 through 5, of the right foot. An x-ray showed that the anatomic alignment of the right foot and the tibiotarsal joint were well-preserved; degenerative changes with spur formation involving the right calcaneal bone were evident. Plaintiff was stable after the surgery and was medicated with Neurontin and Elavil a week later. (A.R. 372-75, 209, 240, 274, 333, 377-78.)

In December 2006, Plaintiff was hospitalized for gastric erosions, tense or moderate to severe ascites, end-stage liver disease and alcoholism ("ESLD-alcoholic"), renal insufficiency, hepatitis C, and cardiac risk factors (CRF). (A.R. 217, 213-90, 242, 482, 482-545, 742-45.) One day after her admission on December 10, 2006, Plaintiff reported that her alcohol abuse had stopped only for the last month. (A.R. 496, 745.) A CT scan of Plaintiff's head revealed a two-centimeter right frontal calcified meningioma that contacted but did not significantly deform the adjacent cerebral cortex and was of doubtful clinical

significance; there was mild beam hardening, minimal senescent
atrophy, and no evidence of vascular territory infarct, mass,
mass effect, or hemorrhage. The assessment was hepatic
encephalopathy; gastrointestinal bleeding secondary to
nonsteroidal, anti-inflammatory drug-induced gastric erosion,
stable; anemia of chronic liver disease; alcoholic liver
cirrhosis; chronic hepatitis C; and coagulopathy with INR
increase. The treatment plan was continued medical management.
(A.R. 224, 238.) On discharge, additional diagnoses were acute
renal insufficiency, end-stage liver disease with coagulopathy,
thrombocytopenia, and esophageal varices. (A.R. 288.) Plaintiff
reported that she had stopped drinking in March 2006. (A.R. 284.)
Again in April 2007, Plaintiff reported having stopped drinking
about a year before. (A.R. 433.)

Plaintiff reported that in early 2007, she ruptured her
posterior tibial tendon. (A.R. 364-66, 649.) In April 2007, an
abdominal echogram survey revealed a 2.3 centimeter hypoechoic
lesion in the right lobe of the liver. (A.R. 453.) Plaintiff
experienced confusion when her ammonia levels were elevated.
(A.R. 416, 428, 431, 456.) In October 2007, Dr. Henry Ow-Yong
opined that due to neuropathy and pain, Plaintiff should have a
permanent handicapped placard. (A.R. 387.) Family nurse
practitioner Mary J. Anderson wrote to the College of the
Sequoias, Plaintiff's school, in 2007 to excuse her for a
semester due to severe motor polyneuropathy. (A.R. 388.) Notes
from the podiatry clinic at Kern Medical Center reflect that in
November 2007, Dr. Brandon Hawkins, D.P.M., diagnosed severe pos
valgus planus deformity, right side, secondary to posterior

18

tibial tendon rupture, right side; he planned surgery to repair the tendon with possible triple arthrodesis. (A.R. 643.)

By January 2008, Plaintiff was hospitalized with a diagnosis of small bowel obstruction that resolved, alcoholic liver cirrhosis, chronic hepatitis C, and peripheral neuropathy. (A.R. 404-05.) Plaintiff reported that she had stopped drinking alcohol in March 2007, and also that she had stopped for more than two years. (A.R. 407.) Plaintiff also suffered pain from a foot surgery. (A.R. 625.) In February 2008, Plaintiff reported no problems, but she also reported to a therapist that her depression, which had initially worsened in June 2007, was worsening again; when making the report, Plaintiff was hyper-verbal and had slurred speech but denied drinking alcohol. The therapist noted that it was possible that her pain medications or unstable mood were causing such symptoms. Plaintiff had never seen a psychiatrist or been admitted to a psychiatric hospital. (A.R. 619-21.) In March 2008, a chest x-ray showed a large, right pleural effusion; this caused delay of anticipated foot surgery. She was feeling pretty good overall. (A.R. 618, 630.) Treatment of her anxiety with Xanax continued. (A.R. 592.)

V. Plaintiff's Testimony

Plaintiff, who was born in 1954 and was fifty-three at the time of the hearing held in June 2008, testified that she completed high school and had some college classes but had to leave school because of her illness. (A.R. 24.) Plaintiff had worked for Target stores for the last fifteen years as a personnel manager, and before that she worked for Hospital Corporation of America in a personnel director's capacity for ten

19

years; she last worked at Target in 2000 and took a leave of absence because of personal problems at home involving her daughter. (A.R. 24, 27.)

Plaintiff had been clean and sober since March 13, 2006, when she went to the hospital for cirrhosis and related problems. (A.R. 27-28.) Plaintiff drank a box or box and one-half of wine a day. (A.R. 29.)

Plaintiff testified that she noticed that something was wrong with her foot, and Dr. Booker ordered an x-ray that showed a "hair bone fracture," and that she was starting to get hammer toes. (A.R. 29.) Plaintiff's counsel represented that the x-ray was from January 2003. (A.R. 30.)

In 2005, she had leg pain, numbness, and diabetes; she was not on insulin but just had to watch her sugar intake and fat grams. She began using a cane about four years before the hearing and could not have walked up to testify without it. (A.R. 31-32.) She had lost sixty-five pounds since December 2005, when she weighed in excess of 200, because she ate less food and went without the calories that she would have ingested had she been consuming alcohol. (A.R. 32.)

Before December 2005, Plaintiff had no problem lifting or carrying things but was having problems standing; she could walk for maybe thirty minutes, alternate sitting and standing thirty minutes each, but would have fatigue and would have to rest for six hours out of every eight-hour day. Each part of the day was bad in some form or fashion, and she would have twenty out of thirty days when she would not be able to function most or all the day. (A.R. 34-37.)

At the time of the hearing, Plaintiff could watch television for thirty minutes but would have to get up and walk and then sit down because she could only stand and sit for maybe ten or fifteen minutes each; she could not walk, could not walk at all without the cane, and did not even venture out of her house. She could lift and carry ten pounds but not continuously. She had taken morphine sulfate since the year before the hearing; she switched to it because Vicodin was an aspirin derivative that Plaintiff could not take because of her liver problem. (A.R. 38-39.) Just the other day a therapist had changed her diagnosis to severe depression, anxiety, and bipolar. (A.R. 39.) Her feet were both starting to swell; her right foot swelled the most and did not permit wearing a tennis shoe because the arch needed to be rebuilt according to the podiatrist. (A.R. 39-40.) Sometimes her equilibrium was off. She had a driver's license but did not drive because she had a stick shift and was going to be selling her car. (A.R. 41.)

Plaintiff's daughter, Christina, had lived with Plaintiff until May 2007; Plaintiff still saw Christina every day when Plaintiff was in Visalia in her apartment; she spoke with her daily when Plaintiff was in Fresno visiting Plaintiff's boyfriend. (A.R. 42.)

Plaintiff testified that she really took a lot of pride in her job, had worked very hard to get where she was, was embarrassed to be receiving help from the government for the first time, and felt bad that everything had blown up in her face. (A.R. 42-43.)

//////

VI. <u>The Testimony of Plaintiff's Daughter</u>

Christina Renee Petitt testified that she had lived with Plaintiff for twenty-two years and moved out a little over a year before the hearing; she still had contact with her mother daily. (A.R. 44.) Plaintiff had been a hard-working, single mother until she stopped working; thereafter, Plaintiff started drinking a lot more, and it got really bad. (A.R. 45.)

Before 2005 Christina noticed Plaintiff had foot problems, and for two to three years before 2005, the walking was horrible; Plaintiff's health was deteriorating, but there was no money to pay for health care, and due to the intoxication, it was difficult to convince Plaintiff that there was something wrong. (A.R. 46.)

In March 2006, Plaintiff was vomiting blood, had blood in her stool, and was starting to lose weight; she was delirious. Before then, Plaintiff always had these episodes, but it was a matter of fighting with her to have an ambulance come; finally Christina could not take it any more. (A.R. 50-51.) Since then, Plaintiff had lost probably about a hundred pounds. (A.R. 47-48, 51.) Christina testified that Plaintiff detoxed in the hospital, and Plaintiff was told that if she drank again, she would die, and she had not drunk since then. (A.R. 48.)

Plaintiff had been unable to wear a shoe on her foot for five to six years, and it had been hurting Plaintiff as long as Christina could remember. (A.R. 52.)

Christina testified that her mother was not someone who was just trying to work the state for money; she had been a hard worker and wanted to work but just was not physically able. (A.R.

52.) Plaintiff could stand five to ten minutes but could not walk like a normal person; she had to lie or sit down to relax; she could concentrate but sometimes could not keep up with the conversation. Christina knew when Plaintiff was becoming toxic from the liver and delirious. (A.R. 49-50.)

VII. Testimony of the Vocational Expert

Mr. Dashlette, a vocational expert (VE), testified that Plaintiff's past work was listed in the Dictionary of Occupational Titles as sedentary, SVP 8, and semi-skilled. (A.R. 53-54.) However, based on Plaintiff's testimony that in her past job the heaviest weight lifted (albeit rarely) was fifty pounds, that she had to do other work on occasion, and that she stood most of the time, the job as performed by Plaintiff was light work. (A.R. 54.) The VE noted, however, that Plaintiff's testimony concerning the time she stood was inconsistent with an exhibit which indicated that she stood one hour and sat seven; the VE assumed that the ALJ credited the testimony presented at hearing. (A.R. 53-54.)

VIII. Credibility Findings

A. The ALJ's Findings

The ALJ detailed Plaintiff's complaints of pain in her extremities, foot problems since 2005, symptoms of disorientation, twenty bad days a month, need to rest six hours a day, need to use a cane for the last four years, and limitations on lifting and carrying, standing, walking, and sitting. (A.R. 13.) He noted Christina's testimony that Plaintiff had been unable to wear shoes on her right foot for the last five to six years. (A.R. 13.) He stated that after considering the evidence

23

of record, he found Plaintiff's medically determinable impairments could reasonably be expected to produce Plaintiff's alleged symptoms, but her statements about the intensity, persistence, and limiting effects of those symptoms were not credible to the extent that they were inconsistent with his assessment of her RFC, for reasons subsequently stated. (A.R. 13.)

### B. Plaintiff's Arguments

Plaintiff disagrees with the ALJ's findings concerning Plaintiff's credibility. (A.R. 11.) Plaintiff notes that some of the medical evidence was consistent with Plaintiff's subjective complaints, and Plaintiff's impairments were progressive; thus, Plaintiff's testimony was supported by objective evidence. Plaintiff also contends that the ALJ failed to state clear and convincing reasons for discounting Plaintiff's subjective allegations of disabling symptoms.

### C. Legal Standards

It is established that unless there is affirmative evidence that the applicant is malingering, then where the record includes objective medical evidence establishing that the claimant suffers from an impairment that could reasonably produce the symptoms of which the applicant complains, an adverse credibility finding must be based on clear and convincing reasons. Carmickle v. Commissioner, Social Security Administration,, 533 F.3d 1155, 1160 (9th Cir. 2008). In Orn v. Astrue, 495 F.3d 625, 635 (9th Cir. 2007), the court summarized the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment. See Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific, cogent reasons for the disbelief.'" Morgan, 169 F.3d at 599 (quoting Lester, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." Id. Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." Id.

Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. See S.S.R. 02-1p (Cum. Ed.2002), available at Policy Interpretation Ruling Titles II and XVI: Evaluation of Obesity, 67 Fed.Reg. 57,859-02 (Sept. 12, 2002); S.S.R. 96-7p (Cum. Ed.1996), available at 61 Fed.Reg. 34,483-01 (July 2, 1996). An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. See 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); see Daniels v. Apfel, 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." Fair, 885 F.2d at 603; see also Thomas, 278 F.3d at 958-59.

Additional factors to be considered in weighing credibility include the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms; treatment, other than medication, the person receives or has received for relief of the symptoms; any

measures other than treatment the claimant uses or has used to
relieve the symptoms; and any other factors concerning the
claimant's functional limitations and restrictions due to pain or
other symptoms. 20 C.F.R. § 404.1529; Soc. Sec. Ruling 96-7p.

    D. <u>Analysis</u>

    Here, the ALJ reasoned that there were few treating records
for Plaintiff's alleged impairments between 2000 and 2005. He
also noted that from April 2000 to December 2005, Dr. Booker, who
was then Plaintiff's primary care doctor, routinely treated
Plaintiff for her hand and foot pain, hypertension, and anxiety
with medication management. (A.R. 13.)

    This reasoning was clear and convincing. An ALJ may rely on
the conservative nature of treatment or a lack of treatment in
rejecting a claimant's subjective complaint of pain. <u>Johnson v.</u>
<u>Shalala</u> 60 F.3d 1428, 1433-34 (9th Cir. 1995). Here, the record
supports the ALJ's conclusions.

    The ALJ also relied on numerous inconsistencies. (A.R. 14,
11-14.) Inconsistent statements are matters generally considered
in evaluating credibility and are properly factored in evaluating
the credibility of a claimant with respect to subjective
complaints. In rejecting testimony regarding subjective symptoms,
permissible grounds include a reputation for dishonesty;
conflicts or inconsistencies between the claimant's testimony and
her conduct or work record, or internal contradictions in the
testimony; and testimony from physicians and third parties
concerning the nature, severity, and effect of the symptoms of
which the claimant complains. <u>Moisa v. Barnhart</u>, 367 F.3d 882,
885 (9th Cir. 2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 958-59 (9th

Cir. 2002). The ALJ may consider whether the Plaintiff's testimony is believable or not. <u>Verduzco v. Apfel</u>, 188 F.3d 1087, 1090 (9ᵗʰ Cir. 1999). Finally, a claimant's not having been a reliable historian and having presented conflicting information about drug and alcohol usage has been considered to be clear and convincing reasoning where the claimant had given conflicting reports, and it was inferred that the claimant's lack of candor extended to her description of physical pain. <u>Thomas v. Barnhart</u>, 278 F.3d 947, 959 (9ᵗʰ Cir. 2002).

Further, amplification of symptoms can constitute substantial evidence supporting the rejection of a subjective complaint of severe symptoms. <u>Matthews v. Shalala</u>, 10 F.3d 678, 680 (9ᵗʰ Cir. 1993).

Here, the ALJ noted evidence pertinent to Plaintiff's overall credibility and general inconsistencies between Plaintiff's complaints and other evidence. With respect to her mental condition, he noted Plaintiff's improvement after being given medication for anxiety and depression; however, he also noted her subsequent failure to take medication or see a therapist. (A.R. 11.) The ALJ noted the mild findings of Dr. McDonald's exam, Dr. McDonald's assessment that Plaintiff might be exaggerating her symptoms and that malingering needed to be ruled out, and Dr. McDonald's GAF of 65. (A.R. 12, 14.) Although Plaintiff testified she left her job at Target because of personal problems at home, the ALJ noted that she stopped working not because she was disabled, but because she was fired for embezzlement. (A.R. 13, 14.) Plaintiff admitted that she was an alcoholic who last drank on March 13, 2006; however, she did not

disclose this to either of the consultative examiners. (A.R. 14.)
Furthermore, the record showed that she was still drinking
alcohol subsequently in November 2006. (A.R. 14.)

The ALJ noted inconsistencies between the medical evidence
and Plaintiff's subjective complaints. He pointed out the x-ray
from 2003 that reflected no fractures or dislocations of the
right foot, but rather a calcaneal spur and an area of
demineralization. (A.R. 13.) Although Plaintiff testified that
she had used a cane for the past four years, the ALJ noted Dr.
Dozier's report from early 2006 that Plaintiff did not use any
assistive device. (A.R. 13, 14.) In reviewing Dr. Dozier's
consulting, internal medicine evaluation, the ALJ noted a two-
year history of Plaintiff's complaints of occasional symptoms in
her hands, and numbness, tingling, and constant, burning pain in
both feet that was generally a "10/10." However, the ALJ noted
that Plaintiff took no medication for relief. (A.R. 14.) Although
Plaintiff had been diagnosed with polyneuropathy likely secondary
to diabetes, she had completed only three tests to evaluate her
blood sugars, and the highest blood sugar was 115 and the lowest
was 80. Further, she was not on any special diet. (A.R. 14.) Dr.
Dozier's physical examination was essentially normal except for
some impairment of sensation in her lower extremities. (A.R. 14.)
The ALJ noted that Dr. Dozier diagnosed peripheral neuropathy,
but the etiology was unknown, and diabetes was to be ruled out.
(A.R. 14.) The ALJ also noted the nerve condition studies and EMG
of September 2005 that showed or suggested evidence of severe
sensory motor polyneuropathy and the ultrasound of the lower
extremities that showed mild, atherosclerotic arterial disease.

(A.R. 13, 14.) He then noted the inconsistent evidence from Dr. Dozier's exam two months later, when her gait was normal. (A.R. 14.)

Although the inconsistency of objective findings with subjective claims may not be the sole reason for rejecting subjective complaints of pain, Light v. Chater, 119 F.3d 789, 792 (9th Cir. 1997), it is one factor which may be considered with others, Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Morgan v. Commissioner 169 F.3d 595, 600 (9th Cir. 1999); Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005). Here, the ALJ's reasoning was clear and convincing and was supported by substantial evidence in the record.

Accordingly, the Court concludes that the ALJ cited multiple clear and convincing reasons for rejecting Plaintiff's subjective complaints regarding the intensity, duration, and limiting effects of her symptoms, and that the ALJ's reasons were properly supported by the record and sufficiently specific to allow this Court to conclude that the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit Plaintiff's testimony.

Neither Plaintiff's disagreement with the ALJ's conclusions nor the presence of some evidence supportive of Plaintiff's complaints dictates a contrary result. It is not the role of this Court to redetermine Plaintiff's credibility de novo. If, as here, the ALJ's interpretation of evidence is rational, this Court must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation. Burch v. Barnhart, 400 F.3d 676, 680-81 (9th Cir. 2005).

1    IX. <u>Lay Testimony</u>

2        Plaintiff argues that the ALJ failed to state any reasons

3    why he "obviously" rejected the testimony of Plaintiff's

4    daughter. (Brief p. 9.)

5        In considering this argument, the Court is mindful that a

6    fundamental principle of review is that this Court is limited to

7    reviewing the findings of the ALJ and to reviewing the specific

8    facts and reasons that the ALJ asserts. <u>Connett v. Barnhart</u>, 340

9    F.3d 871, 874 (9th Cir. 2003). The district court cannot make

10   findings for the ALJ. <u>Id.</u> A district court cannot affirm the

11   judgment of an agency on a ground the agency did not invoke in

12   making its decision. <u>Pinto v. Massanari</u>, 249 F.3d 840, 847-48 (9th

13   Cir. 2001).

14       However, it is not necessary for an ALJ to say expressly

15   that each and every statement or opinion in a case is rejected or

16   accepted; a reviewing court may draw specific and legitimate

17   inferences from discussions of the evidence, particularly where

18   conflicting evidence is detailed and interpreted, and findings

19   are made. <u>See</u>, <u>Magallanes v. Bowen</u>, 881 F.2d 747, 755 (9th Cir.

20   1989).

21       Here, the ALJ expressly detailed the testimony of

22   Plaintiff's daughter concerning her contacts with Plaintiff,

23   Plaintiff's foot problems, Plaintiff's history of hard work and

24   alcoholism after stopping work, and her hospitalization in March

25   2006 and related cessation of alcohol consumption. (A.R. 13.) As

26   the preceding analysis concerning Plaintiff's credibility

27   reflects, the ALJ's reasoning concerning Plaintiff's own

28   credibility included reliance on evidence of Plaintiff's probable

malingering and exaggeration of symptoms, her involvement in
embezzlement, and the absence of candor in her statements
regarding the reasons for her leaving Target, her drinking, and
her need for an assistive device. It is clear that the ALJ
concluded that Plaintiff's representations concerning her
symptoms and limitations were incredible. (A.R. 13.)

Further, the ALJ specifically detailed evidence directly
pertinent to Christina's testimony. Although Plaintiff's daughter
testified that Plaintiff had stopped drinking in March 2006, the
ALJ noted and clearly credited evidence that Plaintiff in fact
had admitted having consumed alcohol as late as November 2006.
(A.R. 13, 14.)

Lay witnesses, such as friends or family members in a
position to observe a claimant's symptoms and daily activities,
are competent to testify to a claimant's condition; the
Commissioner will consider observations by non-medical sources as
to how an impairment affects a claimant's ability to work.
Dodrill v. Shalala, 12 F.3d 915, 918-19 (9th Cir. 1993). An ALJ
cannot discount testimony from lay witnesses without articulating
specific reasons for doing so that are germane to each witness.
Id. at 919.

With respect to evaluating evidence from other non-medical
sources such as spouses, parents, friends, and neighbors who have
not seen the claimant in a professional capacity in connection
with the impairments, the weight to which evidence of is entitled
will vary according to the particular facts of the case; it is
appropriate to consider factors such as the nature and extent of
the relationship with the claimant, whether the evidence is

31

consistent with other evidence, and any other factors that tend
to support or refute the evidence. Soc. Sec. Ruling 06-03p, p. 6.
The adjudicator should generally explain the weight given the
opinions from such other sources or otherwise ensure that the
discussion of the evidence in the determination or decision
allows a claimant or subsequent reviewer to follow the
adjudicator's reasoning when such opinions may have an effect on
the outcome of the case. Id.

Further, it is permissible for an ALJ who has rejected a
claimant's subjective complaints to reject similar evidence from
third-party lay witnesses that is subject to the same reasoning.
Valentine v. Commissioner of the Soc. Sec. Admin., 574 F.3d 685,
693-94 (9th Cir. 2009).

Here, although the ALJ did not make a separate, express
finding concerning the testimony of Plaintiff's daughter, the
ALJ's reasoning was sufficient to permit this Court to review it.
The ALJ concluded that Plaintiff exaggerated and misrepresented
her symptoms, reasoning that was germane to the reliability of
Plaintiff's daughter's testimony.

X. Dr. Dozier's Limitations on Standing and Walking

Plaintiff argues that the ALJ erred in crediting only part
of the opinion of consulting, examining internist Dr. Emanuel
Dozier and rejecting Dr. Dozier's limitation of standing and
walking to only two to four hours in an eight-hour day.

The ALJ reviewed Dr. Dozier's examination and evaluation
from February 2006, noting the subjective complaints made by
Plaintiff to the doctor, the inconsistency of Plaintiff's
complaint of constant pain that was generally a 10/10 with the

32

lack of treatment therefor, the limited test results and absence
of dietary treatment for diabetes, the essentially normal
physical exam except for some impaired sensation in the lower
extremities, and the absence of any assistive device. (A.R. 14.)
He also noted that Dr. Dozier's impression was peripheral
neuropathy with etiology unknown, and that diabetes was to be
ruled out. (Id.)

The ALJ later addressed the opinion evidence, noting the
conflicting opinions of the state agency medical consultants to
the effect that Plaintiff did not have a severe impairment and
that the overall evidence was insufficient to make a residual
functional capacity assessment. (A.R. 14.) The ALJ then stated:

> Consultative examiner Dr. Dozier concluded Ms. Petitt
> could lift and carry 50 pounds occasionally and 25 pounds
> frequently; stand and walk 2 to 4 hours, and sit 6
> hours in an 8-hour workday; and occasionally stoop and
> squat; occasionally climb ladders, scaffolds, or
> overhangs; and occasionally work on inclined planes
> (citation omitted). I give Dr. Dozier's medical
> opinion greater weight because he is an examining
> source. However, because of Ms. Petitt's essentially
> normal examination, I give little weight to the opinion
> that Ms. Petitt can only stand and walk 2 to 4 hours.

(A.R. 14.)

The Court notes that an ALJ may properly rely upon only
selected portions of a medical opinion while rejecting other
parts, Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir. 1989), but
such reliance must be consistent with the medical record as a
whole, Edlund v. Massanari, 253 F.3d 1152, 1159 (9th Cir. 2001).
Further, it is not necessary to agree with everything an expert
witness says in order to hold that his testimony contains
substantial evidence. Russell v. Bowen, 856 F.2d 81, 83 (9th Cir.
1988).

33

With respect to the ALJ's reasoning concerning the expert opinions, the opinion of an examining physician is entitled to greater weight than the opinion of a non-examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995). The uncontradicted opinion of an examining physician may be rejected only if the Commissioner provides clear and convincing reasons for rejecting it. Id.; Edlund v. Massanari, 253 F.3d 1152, 1158-59 (9th Cir. 2001). An ALJ may reject the opinion of an examining physician and adopt the contradictory opinion of a non-examining physician only for specific and legitimate reasons that are supported by substantial evidence in the record. Moore v. Commissioner of Social Security Administration, 278 F.3d 920, 925 (9th Cir. 2002) (quoting Lester v. Chater, 81 F.3d at 830-31).

It is appropriate for an ALJ to consider the absence of supporting findings, and the inconsistency of conclusions with the physician's own findings, in rejecting a physician's opinion. Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995); Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). A conclusional opinion that is unsubstantiated by relevant medical documentation may be rejected. See Johnson v. Shalala, 60 F.3d 1428, 1432-33 (9th Cir. 1995).

Further, the fact that an opinion is based primarily on the patient's subjective complaints may be properly considered. Matney on Behalf of Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). For example, where a treating source's opinion is based largely on the Plaintiff's own subjective description of his or her symptoms, and the ALJ has discredited the Plaintiff's

claim as to those subjective symptoms, the ALJ may reject even a treating source's opinion. <u>Fair v. Bowen</u>, 885 F.2d 597, 605 (9th Cir. 1989).

Here, the ALJ stated specific and legitimate reasons for rejecting the particular limitations. In the circumstances of the present case, the ALJ's reasoning was of clear and convincing force. The record supports the ALJ's conclusions; Dr. Dozier's exam was essentially normal except for the sensory abnormalities. The ALJ expressly found that Plaintiff's peripheral neuropathy was not as limiting as she alleged based on reasoning concerning Plaintiff's lack of credibility. The ALJ detailed the extensive subjective complaints related to Dr. Dozier by Plaintiff concerning symptoms in her extremities and her capacity to stand and walk. (A.R. 14.) In concluding that the findings upon examination did not support the doctor's limitations of standing and walking, the ALJ necessarily opted to rely on the more objective findings instead of the subjective complaints, which were discounted.

Plaintiff argues that there is evidence that was consistent with the doctor's limitations, namely, evidence that Plaintiff suffered mild atherosclerotic disease in the legs, deformities of the foot, and severe sensory motor polyneuropathy as seen in diabetes mellitus. However, to the extent that medical evidence is inconsistent or conflicting, it is the responsibility of the ALJ to resolve any conflicts. <u>Morgan v. Commissioner</u>, 169 F.3d 595, 603 (9th Cir. 1999); <u>Saelee v. Chater</u>, 94 F.3d 520, 522 (9th Cir. 1996); <u>Matney on Behalf of Matney v. Sullivan</u>, 981 F.2d 1016, 1020 (9th Cir. 1992). Here, the ALJ set forth the evidence

and his reasoning concerning his weighing of that evidence. Substantial evidence supported his reasoning. The evidence was susceptible to more than one rational interpretation, and the ALJ's conclusion will be upheld. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

XI. The Opinion of Mary Anderson, F.N.P.

Plaintiff argues that the ALJ failed to evaluate the opinion of Mary Anderson, F.N.P., at Visalia Health Clinic.

Contrary to Plaintiff's assertion, the ALJ did set forth his evaluation of Anderson's opinion. Immediately after weighing Dr. Dozier's opinion, the ALJ stated:

> On December 6, 2005, nurse [practitioner] Mary Anderson completed a form indicating Ms. Petitt was permanently disabled due to diabetes, neuropathy, hypertension, and anxiety (citation omitted). Ms. Anderson's opinion is not consistent with the sparse treatment record before the date last insured. It appears she was accommodating Ms. Petitt in order for her to receive General Relief. Furthermore, a family nurse [practitioner] is not an "acceptable medical source" under the regulations.

(A.R. 15.)

As Defendant notes (Brief p. 11), Anderson's opinion was not a "medical opinion," which is a statement from an acceptable medical source that reflects a judgment about the nature and severity of a claimant's impairments, including the severity of the impairment, its symptoms, a diagnosis and prognosis, a statement of what the claimant can still do despite his or her impairments, and any physical or mental restrictions. 20 C.F.R. § 404.1527(a)(2). Instead, it was only a determination of whether or not Plaintiff could work. The opinion of even a medical source on the ultimate issue of disability is not conclusive. 20 C.F.R.

§ 404.1527(e)(1); <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1148 (9th Cir. 2001); <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989). Even a treating physician's controverted opinion on the ultimate issue of disability may be rejected by an ALJ if the ALJ provides specific and legitimate reasons. <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1202 (9th Cir. 2001).

As Defendant further notes, the record does not demonstrate that Anderson was even a "medical source." Symptoms of the claimant alone cannot establish a physical or mental impairment; rather, there must be evidence from an acceptable medical source. 20 C.F.R. §§ 404.1502, 404.1513(a). Acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). Evidence from other sources may be used to show the severity of impairments and the effect on a claimant's ability to work.

A nurse practitioner or physician's assistant is generally included as an "other" source. 20 C.F.R. § 404.1513(d). However, a physician's assistant may be considered to be an acceptable medical source where the assistant consults frequently and works closely with a physician and thus acts as an agent of the doctor in the relationship with the patient. In <u>Gomez v. Chater</u>, 74 F.3d 967, 970-71 (9th Cir. 1996), the court relied on 20 C.F.R. § 416.913 regarding reports of interdisciplinary teams and determined that a nurse practitioner who worked in conjunction with, and under the close supervision of, a physician could be considered an acceptable medical source, but one working on his or her own was not an acceptable medical source.

Here, the absence of evidence of close supervision of Anderson by any doctor, and indeed, the absence of probative evidence regarding the interrelationship of Anderson with any other medical professionals precludes reliance on her opinions as those of an acceptable medical source. However, Anderson, as a nurse practitioner, was an other medical source who was appropriately considered with respect to the severity of Plaintiff's impairment and how it affected her ability to work.

The fact that a medical opinion is from an acceptable medical source is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an acceptable medical source because acceptable medical sources are the most qualified health care professionals. 20 C.F.R. § 404.1513(a); Soc. Sec. Ruling 06-03p; see, Gomez v. Chater, 74 F.3d at 970-71.

Here, the ALJ considered Anderson's opinion and gave little weight to it because Anderson was not an acceptable medical source. (A.R. 15.) This is a reason germane to her opinion and thus suffices to support rejection. Cf. Dodrill v. Shalala, 12 F.3d 915, 918-19 (9th Cir. 1993). Further, the record supports the ALJ's reasoning that Anderson's opinion that Plaintiff was physically and mentally incapacitated from any type of work was inconsistent with the treatment record. (A.R. 15.)

Accordingly, the Court concludes that the ALJ stated specific, legitimate, and germane reasons for not accepting Anderson's opinion.

XII. Failure to Obtain an Expert regarding Date of Onset

Plaintiff contends that the ALJ failed to comply with Social

38

Security Ruling 83-20, which may require consultation with a
medical expert concerning the date of onset of a disabling
impairment.

When a claimant proceeding pursuant to Title II has a period
of eligibility for disability benefits that expires on a specific
date, it is the burden of the claimant to establish that the
claimant was either permanently disabled or subject to a
condition which became so severe as to disable the claimant prior
to the date on which his or her disability insured status
expired. Sam v. Astrue, 550 F.3d 808, 810-11 (9th Cir. 2008).

Social Security Ruling 83-20 states the policy and describes
the relevant evidence to be considered when establishing the
onset date of disability under Titles II and XVI of the Social
Security Act. Soc. Sec. Ruling 83-20, p. 1. The onset date of
disability is the first day a claimant is disabled as defined in
the Act and the regulations. Id. The determination of the onset
date of disability is undertaken "[i]n addition to" determining
that a claimant is disabled. Id.

Here, the ALJ determined that Plaintiff was not disabled
from the alleged onset date of July 8, 2000, through December 31,
2005, the date last insured. (A.R. 15.) In such circumstances,
Soc. Sec. Ruling 83-20 does not require a medical expert. Sam v.
Astrue, 550 F.3d 808, 809-11. This is because where an ALJ finds
that a claimant was not disabled at any time through the date of
the decision, the question of when the claimant became disabled
does not arise, and the procedures prescribed in Soc. Sec. Ruling
83-20 do not apply. Id. at 810.

/////

XIII. <u>Disposition</u>

Based on the foregoing, the Court concludes that the ALJ's decision was supported by substantial evidence in the record as a whole and was based on the application of correct legal standards.

Accordingly, the Court AFFIRMS the administrative decision of the Defendant Commissioner of Social Security and DENIES Plaintiff's Social Security complaint.

The Clerk of the Court IS DIRECTED to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Linda P. Petitt.

IT IS SO ORDERED.

Dated: __March 2, 2010__          _____/s/ **Gary S. Austin**_____
                                   UNITED STATES MAGISTRATE JUDGE